UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SUMADI HENDRIX,

           Petitioner,

    v.

SHAWN HATTON,

           Respondent.

Case No. 16-cv-07008-EMC

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

## I.    INTRODUCTION

Sumadi Hendrix filed this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 to challenge his state court conviction for assault with intent to commit rape. Respondent has filed an answer to the petition and Mr. Hendrix has filed a traverse. For the reasons discussed below, the Court denies the petition.

## II.    BACKGROUND

The California Court of Appeal described the evidence at trial:

> On January 21, 2012, Margaret Doe was living in a San Jose apartment. Margaret drove home alone that night and, at about 11:30 p.m., she parked on the street, which ended in a cul-de-sac. She was wearing a loose pullover sweatshirt. It was "really dark." She collected her things, got out of the car and closed the door, and discovered defendant standing two to three feet away from her, which shocked her. He had a pit bull puppy on a leash with him. Margaret had seen defendant walking his dog around the neighborhood before but had never had a conversation with him.
>
> Defendant twice asked Margaret whether she wanted to go on a walk with him. She said no both times; she was feeling nervous and anxious. Margaret began to walk toward her apartment, which was about 20 feet away. For about "a good ten feet," defendant walked alongside her at the same pace. At this point, she was terrified. Margaret walked past her apartment and continued walking straight

instead of turning toward her apartment because defendant was in between her and her apartment.

At some point, defendant moved in front of Margaret and "bear-hugged" her. He grabbed Margaret around her shoulders with both of his arms; her arms were down by her sides. Defendant then put one arm around her waist and, with his other hand, touched her back, breasts, stomach, legs, and her buttocks over her sweatshirt or jeans. He groped her breasts for approximately five seconds and squeezed her buttocks with his whole hand. Margaret tried to resist by pushing against defendant's chest with her forearms. She was scared and she did not want to anger him because she was afraid he would hit her.

Margaret said that her roommate was coming and she had to go. Defendant asked her whether she had ever had sex with a black man before. She said no. Defendant queried whether he could be her first. He asked her to have sex with him. She said that she did not want to. His hand was continually around her waist. Margaret was not giggling, smiling, or flirting with him. Defendant indicated that sex would happen only one time because he did not want his girlfriend to find out. He specifically told her that he did not want her telephone number. Defendant said that his girlfriend and he had a baby together and defendant and Margaret "would have to keep it a secret or else it would ruin his life." Defendant said something like, "After we're done here, you're not going to tell my girlfriend."

Defendant asked Margaret if she was "good at giving head" and whether she "would give it to him." Margaret said that "he should have his girlfriend do that for him." She did not agree to give him oral sex.

Defendant held Margaret's wrist and tried to put her hand down his pants. She kept resisting and was able to pull her hand back.

During this period of touching, Margaret had repeatedly stepped back from defendant, who followed. At some point, Margaret realized that they had backed up to the curb next to the wall of the freeway. She was concerned because there was no light there and there were bushes. No one else was out on the street. Margaret was feeling terrified. Defendant put his hand in the pockets of Margaret's jeans and tried to pull down her pants. She "tried to grab the belt loops and pull them back up." Defendant told Margaret that he was stronger than she. She understood that statement to mean that if she fought him or made a scene, she could not stop him. Margaret did not scream because she thought that he might hit her or grab her mouth and "that would be it." Defendant began kissing her neck and she tried to pull away. He tried to open her mouth with his fingers. He told her that she would like this and she wanted it. She tried to tell him that she did not want it or like it but that did not stop defendant.

One car pulled up and did a quick U-turn but that did not stop defendant. A few minutes later, a second car came down the street, stopped, and double parked with its lights on. When the second car illuminated the area where they were, defendant let Margaret go and

stepped back. Margaret ran fast to her car, got inside, and drove to her cousin Johnny's house, which was not far. She was crying, upset, and shaking. Margaret's interaction with defendant had lasted between 10 to 15 minutes.

Margaret told her cousin what had happened. She did not call the police; she did not think there was anything anyone could do because she was not raped and she was not hit. She was there approximately 45 minutes. Margaret's cousin told her to go to her sister and her sister would advise her. Margaret's sister received a call from Margaret, who was "really, really upset" and crying. Margaret drove to her sister's home and told her sister that a black man had tried to rape her. Margaret's sister called their mother and they convinced Margaret to call police. Margaret's sister telephoned 9–1–1 for her and Margaret spoke with the operator.

At about 3:45 p.m. on January 22, 2012, San Jose Police Officer Angelo Delossantos responded to a call of attempted rape. The officer went to the home of Margaret's sister and spoke with Margaret, who was very scared. Officer Delossantos collected a DNA sample from Margaret's neck using a swab.

On April 27, 2012, Margaret subsequently selected a photograph of defendant from a six-photograph lineup.

On August 2, 2012, while Margaret was working at Jamba Juice in Willow Glen, defendant came into the store with a female and a baby. She recognized him and they looked at each other and froze. She was scared and went into the back of the store, where she watched the store's cameras. Defendant remained in the store for some time. She called the detective assigned to the case. On August 2, 2012, San Jose Police Officer Tina Latendresse received a telephone call from Margaret, who "sounded panicked, frantic, [and] scared...."

On September 10, 2012, Officer Latendresse collected DNA samples from defendant's cheeks using buccal swabs.

*People v. Hendrix*, No. H040456, 2015 WL 3883173 (Cal. Ct. App. June 24, 2015) at *1-3.

Evidence was presented that the DNA swab from Ms. Doe's neck contained a mixture of female and male DNA, and that Ms. Doe was the source of the female DNA. A criminologist testified that "the evidence was 'extremely strong' that Margaret and defendant were the contributors" of the DNA on the swab taken from Margaret's neck. *Id.* at *3.

Following the jury trial in Santa Clara County Superior Court, Mr. Hendrix was convicted of assault with the intent to commit rape.[1] He was sentenced to 13 years in prison.

---

[1] This was the second trial, and it took place in May 2013, two months after the first one ended in a mistrial. *See* CT 215-29, 275. According to Respondent, the jury had deadlocked 11-1 in favor

Mr. Hendrix appealed. The California Court of Appeal affirmed his conviction in June 2015, and the California Supreme Court denied his petition for review in September 2015. Mr. Hendrix also filed a petition for writ of habeas corpus in the California Supreme Court, which was summarily denied in April 2016. Docket No. 1 at 8.

Mr. Hendrix then filed his federal petition for writ of habeas corpus. His petition presents the following claims: (1) his Fourteenth Amendment right to due process was violated because the CALCRIM 890 jury instruction used at his trial "is void for vagueness," Docket No. 1 at 10; (2) his Fourteenth Amendment right to due process was violated because the evidence was insufficient to support his conviction; and (3) his Sixth Amendment right to effective assistance of counsel was violated in that counsel (a) "recommended even insisted that petitioner not take the stand because Margaret's inconsistencies were enough," and (b) did not move to dismiss or object to the use of the 9-1-1 tape. Docket no. 7-9 at 105. The Court ordered Respondent to show cause why the petition should not be granted. Respondent has filed an answer to the petition, and Mr. Hendrix has filed a traverse. The matter is now ready for decision.

### III.   JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this action for a writ of habeas corpus under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the petition concerns the conviction and sentence of a person convicted in Santa Clara County, California, which is within this judicial district. 28 U.S.C. §§ 84, 2241(d).

### IV.   STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review. A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of

of a guilty verdict at the first trial. Docket No. 7-1 at 7 n.1.

the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'" *Id.* at 409.

Section 2254(d) generally applies to unexplained as well as reasoned decisions. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011). When the state court has denied a federal constitutional claim on the merits without explanation, the federal habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court." *Id.* at 102.

## V. DISCUSSION

### A. Instructional Error Claim

Mr. Hendrix's first claim concerns the use of the phrase "by its nature" in the following

5

jury instruction on assault with intent to commit rape:

> The Defendant is charged in Count One with assault with intent to commit rape in violation of Penal Code Section 220(a).
>
> To prove that the defendant is guilty of this crime, the People must prove:
>
> 1. The defendant did an act that *by its nature* would directly and probably result in the application of force to a person;
>
> 2. The defendant did that act willfully;
>
> 3. When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act *by its nature* would directly and probably result in the application of force to someone;
>
> 4. When the defendant acted, he had the present ability to apply force to a person; and
>
> 5. When the defendant acted he intended to commit rape.
>
> Someone commits an act "willfully" when he does it willingly or on purpose.
>
> The terms "application of force" and "apply force" mean to touch in a harmful or offensive manner. The slightest touching can be enough if it is done in a rude or angry way. Making contact with another person, including through his or her clothing, is enough. The touching does not have to cause pain or injury of any kind.
>
> No one needs to actually have been injured by the defendant's act. But if someone was injured, you may consider that fact, along with all the other evidence, in deciding whether the defendant committed an assault.
>
> For a definition of rape, please refer to jury instruction 1000 which defines that crime.

CT 373 (CALCRIM 890) (emphasis added). In addition to the foregoing, the jury also was instructed with CALCRIM 1000, which defined rape.[2]

_____

[2] CALCRIM No. 1000 stated:

> This instruction provides the definition of rape.
>
> 1. The defendant had sexual intercourse with a woman;
>
> 2. He and the woman were not married to each other at the time of the intercourse;

1    Mr. Hendrix contends that his right to due process was violated because the CALCRIM

2 890 jury instruction used at his trial was unconstitutionally vague.  The alleged vagueness is in the

3 use of the phrase "by its nature," which appears twice in the instruction.  Mr. Hendrix argues that

4 this phrase means "that the risk is measured in the abstract based on a hypothetical ordinary

5 commission and not on the actual facts of the case."  Docket No. 1 at 10.  He asks, "how could the

6 jury not misapply" the instruction "that is so vague it forces the jury to base [its] decision on a

7 hypothetical, imagined ordinary case of the crime instead of the actual conduct."  Docket No. 8 at

8 3.

9    This claim was rejected by the California Supreme Court without discussion, and there is

10 no lower court opinion discussing the claim (because the claim was not presented to a lower state

11

12

---

3. The woman did not consent to the intercourse;

4. The defendant accomplished the intercourse by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to the woman.

"Sexual intercourse" means any penetration, no matter how slight, of the vagina or genitalia by the penis.

To "consent," a woman must act freely and voluntarily and know the nature of the act.

"Duress" means a direct or implied threat of force, violence, danger, or retribution that would cause a reasonable person to do or submit to something that she would not do or submit to otherwise. When deciding whether the act was accomplished by duress, consider all the circumstances, including the woman's age and her relationship to the defendant.

"Menace" means a threat, statement, or act showing an intent to injure someone.

Intercourse is accomplished by "fear" if the woman is actually and reasonably afraid.

A defendant is not guilty of rape if he actually and reasonably believed that the woman consented to the intercourse. The People have the burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe that the woman consented. If the People have not met this burden, you must find the defendant not guilty.

CT 374-75 (CALCRIM 1000).

7

court).  Therefore, the federal habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court."  *Harrington*, 562 U.S. at 102.

To obtain federal habeas relief for an error in the jury instructions, a petitioner must show that the error "so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).  A jury instruction violates due process if it fails to give effect to the requirement that "the State must prove every element of the offense."  *Middleton v. McNeil*, 541 U.S. 433, 437 (2004).  "'A single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.'"  *Id.* (quoting *Boyde v. California*, 494 U.S. 370, 378 (1990)).  "Even if there is some 'ambiguity, inconsistency, or deficiency' in the instruction, such an error does not necessarily constitute a due process violation."  *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009) (quoting *Middleton*, 541 U.S. at 437).  Where an ambiguous or potentially defective instruction is at issue, the court must inquire whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution.  *Estelle*, 502 U.S at 72 & n.4; *Boyde*, 494 U.S. at 380.

If a constitutional error is found in the omission of an instruction, the federal habeas court also must determine whether that error was harmless by looking at the actual impact of the error. *Calderon v. Coleman*, 525 U.S. 141, 146-47 (1998).  The habeas court must apply the harmless-error test set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), and determine whether the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'"  *Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008) (per curiam) (quoting *Brecht*, 507 U.S. at 623).

Here, the California Supreme Court reasonably could have determined that the phrase "by its nature" in the CALCRIM 890 instruction was not vague and was instead a correct statement of California law because the California Supreme Court earlier had embraced that very phrase to describe the mental state required for an assault.  In *People v. Williams*, 26 Cal. 4th 779, 786-87 (Cal. 2001), the court examined the mental state necessary for an assault and explained that earlier cases had struggled by trying to define the mental state solely within the traditional framework of

8

specific intent and general intent crimes, when assault did not fit neatly within either category. "Because assault criminalizes conduct based on what *might* have happened--and not what *actually* happened--the mental state for assault incorporates the language of probability, i.e., direct, natural and probable consequences." *Id.* at 787. The *Williams* court held that an "assault does not require a specific intent to cause injury or a subjective awareness of the risk that an injury might occur. Rather, assault only requires an intentional act and actual knowledge of those facts sufficient to establish that the act *by its nature* will probably and directly result in the application of physical force against another." *Id.* at 790 (emphasis added).[3] For example, "a defendant who honestly believes that his act was not likely to result in a battery is still guilty of assault if a reasonable person, viewing the facts known to defendant, would find that the act would directly, naturally and probably result in a battery." *Id.* at 788 n.3. Recklessness and criminal negligence are not enough to show the requisite mental state "because a jury cannot find a defendant guilty of assault based on facts he should have but did not know." *Id.* at 788. Here, the California Supreme Court reasonably could have concluded that the CALCRIM 890 instruction used at Mr. Hendrix's trial was not vague with respect to the mental state required for the assault because it accurately described the mental state required under California law. That is, the defendant had to willfully act while being "aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone." CALCRIM 890. *Cf. Williams*, 26 Cal. 4th at 788 ("a defendant guilty of assault must be aware of the facts

---

[3] The principle is easier to understand when the facts are less straightforward than when a defendant makes body-to-body contact with the victim. A more typical challenge to the intent aspect of assault occurs when a defendant has used some sort of object to cause the assault and/or when there is some question as to whether the defendant was aware of the victim's presence in the area to which the object was directed by the defendant. *See, e.g., Williams*, 26 Cal. 4th at 790 (upholding conviction for assault with a deadly weapon where defendant admitted that he loaded his shotgun, knew the victim was crouched on the far side of the truck between the rear fender and cab, and fired a "warning shot" at the truck -- "In light of these admissions, defendant undoubtedly knew those facts establishing that his act by its nature would directly, naturally and probably result in a battery"); *People v. White*, 241 Cal. App. 4th 881, 884-85 (Cal. Ct. App. 2015) (upholding conviction for assault on a peace officer with force likely to produce great bodily harm where defendant threw metal showerhead at wire-reinforced glass with sufficient force to shatter the glass, causing particles to hit peace officers on the other side); *People v. Navarro*, 212 Cal. App. 4th 1336, 1344-46 (Cal. Ct. App. 2013) (upholding conviction for assault with a semiautomatic weapon where defendant shot at door through which victim had just passed after arguing defendant).

that would lead a reasonable person to realize that a battery would directly, naturally and probably result from his conduct"); *id.* at 790 ("assault only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another").

The California Supreme Court reasonably could have determined that, even if the phrase "by its nature" was ambiguous, there was no "reasonable likelihood" that the jury had applied the challenged instruction in a way that violated the Constitution. *See Estelle*, 502 U.S at 72 & n.4. Contrary to Mr. Hendrix's suggestion, the instruction did not call upon the jury to base its decision on a hypothetical ordinary commission of the crime rather than the actual facts of the case presented. The jury had to consider the probability of risk as would be understood by a reasonable person, but had to assess that probability based on the act done by Mr. Hendrix and based on the facts of which he was aware at the time he did the act. The instruction required the jury to find that Mr. Hendrix "did an act that by its nature would directly and probably result in the application of force to a person," and that, when Mr. Hendrix "acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone." CALCRIM 890. Although there may be some cases where the assault is indirect and intent questions are difficult, *see* footnote 3, *supra*, this was not such a case. The testimony of Ms. Doe showed that Mr. Hendrix actually and forcefully touched her body with his body. She testified that Mr. Hendrix grabbed her, squeezed her buttocks, groped her breasts, tried to pry open her mouth, tried to pull down her jeans, and licked and kissed her neck. And she testified that this occurred after she declined his requests to have sex with her and while she was attempting to push him away. Given Ms. Doe's testimony that Mr. Hendrix directly applied force to her body under these circumstances, the California Supreme Court quite reasonably could have concluded that there was no likelihood that the jury applied the instruction in a way that violated the constitution or otherwise found him guilty based on less than proof beyond a reasonable doubt of all the elements of assault. *See Estelle*, 502 U.S. at 72 & n.4.

Mr. Hendrix identifies three cases in support of his argument that the instruction is void for vagueness. The cases cited by Mr. Hendrix are not on point because they concern allegedly vague

10

statutes, rather than allegedly vague jury instructions.  *See* Docket No. 1 at 10 (citing *Johnson v. United States*, 135 S. Ct. 2551 (2015) (increased sentence imposed under residual clause of Armed Career Criminal Act violated due process because clause was unconstitutionally vague); *Kolender v. Lawson*, 461 U.S. 352, 361-62 (1983) (statute requiring persons who loiter to provide a "credible and reliable" identification was unconstitutionally vague because it failed to clarify what was contemplated by the requirement that a suspect provide a "credible and reliable" identification, and left it to the police to determine what identification would be sufficient); *United States v. Batchelder*, 442 U.S. 114, 123 (1979) ("vague sentencing provisions may pose constitutional questions if they do not state with sufficient clarity the consequences of violating a given criminal statute").  None of these cases require that *jury instructions* be free of vagueness.  And the principles are not readily transferrable because criminal statutes and jury instructions serve different purposes.  In *Johnson*, the Court explained that the government violates a person's right not to be deprived of life, liberty or property without due process of law when it takes away someone's life, liberty or property "under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement."  *Johnson*, 135 S. Ct. at 2556.  The principle that a law must give a person fair notice of what is criminal does not translate to the jury instruction context or provide some limit on official discretion.

The California Supreme Court's rejection of Mr. Hendrix's due process challenge to the jury instruction on assault with intent to commit rape was not an unreasonable application of, or contrary to, any holding of the U.S. Supreme Court.  Mr. Hendrix is not entitled to the writ of habeas corpus on this claim.

B.    Sufficiency of the Evidence

Mr. Hendrix argues that the evidence was insufficient to support the conviction for assault with attempt to commit rape.  He points to several portions of Ms. Doe's testimony that, in his view, show her testimony to be unreliable and therefore insufficient to show that he acted with an intent to commit rape.  First, he points out that Ms. Doe testified that Mr. Hendrix had a playful puppy on a leash, "meaning the defendant chose to stay one-handed."  Docket No. 7-9 at 103.

Second, he suggests that his demeanor was not threatening or menacing enough to show an intent to commit rape. He points out that Ms. Doe testified that Mr. Hendrix: asked questions and sought permission, did not threaten her, did not hurt her, did not say he was going to hurt her, and did not say he was going to rape her. *Id.* And he points out that both Mr. Hendrix and Mr. Doe spoke calmly. *Id.* Third, he appears to suggest that no intent to commit rape could be inferred because a rape did not occur, even though their interaction lasted 15 minutes in a dark area and her resistance "'wasn't a harsh amount.'" *Id.* Mr. Hendrix concludes that the "weight of [Ms. Doe's] inconsistencies prove her statement unreliable." *Id.*

This claim was not presented on direct appeal and was instead presented only in Mr. Hendrix's *pro se* petition for writ of habeas corpus to the California Supreme Court. Because the California Supreme Court summarily rejected the challenge to the sufficiency of the evidence, the federal habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court." *Harrington,* 562 U.S. at 102.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A court reviewing a conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt, but rather determines whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt may a court conclude that the evidence is insufficient. *See Jackson*, 443 U.S. at 324. The "prosecution need not affirmatively 'rule out every hypothesis except that of guilt,'" and the reviewing federal court "'faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Wright v. West*, 505 U.S. 277, 296-97 (1992)

(quoting *Jackson*, 443 U.S. at 326).

"*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" *Coleman v. Johnson*, 566 U.S. 650, 655 (2012) (per curiam) (quoting *Jackson*, 443 U.S. at 319). "[O]n habeas review, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge" unless "the state court decision was objectively unreasonable." *Id.* at 651 (internal quotation marks omitted).

The *Jackson* standard is applied to a crime as that crime is defined by state law. *Jackson*, 443 U.S. at 324 n.16. The first step is to look at the elements of the crime of which the defendant stands convicted – here, the crime is assault with intent to commit rape. Under California law, the crime of rape has four elements: (1) the defendant had sexual intercourse with a woman; (2) he and the woman were not married; (3) the woman did not consent to the intercourse; and (4) the defendant accomplished the intercourse by force, violence, duress, menace, or fear of immediate and unlawful bodily injury. *See* CT 374-75 (CALCRIM 1000); Cal. Penal Code § 261(a)(2). "The essential element of [assault with intent to commit rape] is the intent to commit the act against the will of the complainant. The offense is complete if at any moment during the assault the accused intends to use whatever force may be required. [I]f there is evidence of the former intent and acts attendant to the execution of that intent, the abandonment of that intent before consummation of the act will not erase the felonious nature of the assault." *People v. Maury*, 30 Cal. 4th 342, 399-400 (Cal. 2003) (brackets in original) (citations omitted).

Here, the evidence was sufficient to support the jury's determination that Mr. Hendrix was the perpetrator of the crime. The identity of Mr. Hendrix as the perpetrator was firmly established by Ms. Doe's testimony and her identification of him in a photo line-up, as well as the criminologist's testimony about the DNA evidence that was "extremely strong" that Mr. Hendrix and Ms. Doe were the sources of the DNA swab taken from Ms. Doe's neck.

The main focus of trial, and Mr. Hendrix's habeas claim, concerns the sufficiency of the evidence to show that he acted with an intent to commit rape. The evidence was sufficient to support the jury's determination that Mr. Hendrix assaulted Ms. Doe with the intent to commit

13

rape. Ms. Doe's testimony established that: Mr. Hendrix approached her at night in a dark area devoid of other pedestrians; Mr. Hendrix would not take "no" for an answer to his sexual advances; Ms. Doe did not smile, giggle, flirt or otherwise indicate any interest in having sex with Mr. Hendrix; Mr. Hendrix stayed with her despite Ms. Doe's efforts to walk away from him; Mr. Hendrix impliedly threatened Ms. Doe by stating, "I am stronger than you"; Mr. Hendrix bear-hugged her and then groped her buttocks and breasts as she tried to push him away; Mr. Hendrix tried to pull Ms. Doe's pants down[4]; and Mr. Hendrix only let go of Ms. Doe when a car stopped and its headlights shone on them. On this evidence, a rational jury easily could find that Mr. Hendrix intended to commit rape against the will of Ms. Doe, and he intended to use whatever force may be required. *See People v. Maury*, 30 Cal. 4th at 399-400. Applying the jury instructions to the facts, a rational jury could have found that Mr. Hendrix willfully "did an act that by its nature would directly and probably result in the application of force" to Ms. Doe, that Mr. Hendrix was at the time "aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force" to Ms. Doe; and that, when he acted, Mr. Hendrix had the present ability to apply force to Ms. Doe and had the intent to commit rape. *See* CALCRIM 890.

The "inconsistencies" that Mr. Hendrix identifies in Ms. Doe's testimony do not undermine the conviction because the jury clearly found Ms. Doe credible despite these alleged inconsistencies. In fact, many of the inconsistencies now identified by Mr. Hendrix were argued by defense counsel in his closing argument. For example, defense counsel argued that Ms. Doe's reported fear immediately upon seeing Mr. Hendrix did not make sense since she told him where she went to school and had seen him several times in the area before, RT 506-07; defense counsel argued that Ms. Doe's reported terror was inconsistent with her delaying several hours before contacting the police that night and with her later lack of cooperation with police, RT 507-08;

---

[4] The prosecutor particularly emphasized Mr. Hendrix's efforts to pull down Ms. Doe's pants as showing his intent to rape her: "He's trying to get her pants down and she's trying to keep her pants up any which way she can. [¶] Why is he trying to get her pants off? What's inside a woman's pants? Not to be too graphic. Inside a woman's pants is a vagina. If at that point in time he wanted to orally copulate her or have her orally copulate him, there is no need for him to pull down her pants." RT 498.

defense counsel argued that Ms. Doe testified that Mr. Hendrix spoke calmly, made no overt threats, and held the leash for his playful puppy -- suggesting these facts were inconsistent with him instilling fear in her, RT 509; counsel argued that Mr. Hendrix's reported questions as to whether she wanted to perform oral sex on him and his statements that he did not want a relationship and did not want her phone number showed a lack of intent to commit rape, RT 512-13; counsel argued that the fact that the interaction lasted about 15 minutes without "some sort of demonstrative act to let us know what his intentions were" meant that the jury did not have enough evidence to show intent to commit rape, RT 513.

At trial and here, Mr. Hendrix urges that his calm speech, the absence of overt threats, and the fact that he was with Ms. Doe for approximately 15 minutes without raping her shows that he did not intent to commit rape. Even if one assumes that these facts supported his preferred inference (i.e., that he lacked an intent to commit rape), it does not show the evidence to be insufficient to support the guilty verdict. When the record supports conflicting inferences, the federal habeas court must presume "that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson,* 443 U.S. at 326.

It cannot be said that the California Supreme Court's rejection of Mr. Hendrix's due process challenge to the sufficiency of the evidence was "objectively unreasonable." *See Coleman*, 566 U.S. at 651. Mr. Hendrix therefore is not entitled to the writ of habeas corpus on this claim.

C.    Ineffective Assistance of Trial Counsel Claims

Mr. Hendrix contends that trial counsel provided ineffective assistance of counsel in two ways. First, counsel allegedly was ineffective when he advised Mr. Hendrix not to testify. Second, counsel allegedly was ineffective in failing to move to dismiss or object to the use of the 9-1-1 tape.

The Sixth Amendment's right to counsel guarantees not only assistance, but effective assistance, of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just

result.  *Id.*  In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a petitioner must establish two things.  First, he must demonstrate that counsel's performance was deficient and fell below an "objective standard of reasonableness" under prevailing professional norms.  *Id* at 687-88.  Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is at a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  *Id.*

A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims under § 2254.  *See Cullen v. Pinholster*, 563 U.S. 170, 202 (2011).  The "question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington v. Richter*, 562 U.S. at 105.

1.  Advice Not To Testify

"The *Strickland* standard is applicable when a petitioner claims his attorney was ineffective by denying him his constitutional right to testify." *Matylinsky v. Budge*, 577 F.3d 1083, 1097 (9th Cir. 2009); *see Gulbrandson v. Ryan*, 738 F.3d 976, 989 (9th Cir. 2013).  That is, the petitioner must show both deficient performance and prejudice under *Strickland* to obtain relief on a claim that his attorney was ineffective in not putting the petitioner on the witness stand.

"Although the ultimate decision whether to testify rests with the defendant, he is presumed to assent to his attorney's tactical decision not to have him testify. . . . [I]f the defendant wants to testify, he can reject his attorney's tactical decision by insisting on testifying, speaking to the court, or discharging his lawyer.  Thus, waiver of the right to testify may be inferred from the defendant's conduct and is presumed from the defendant's failure to testify or notify the court of his desire to do so." *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993); *United States v. Pino-Noriega*, 189 F.3d 1089, 1095 (9th Cir. 1999).

Here, before trial, *the court* discussed with Mr. Hendrix his right to testify:

> You have a right to testify in this trial, Mr. Hendrix, and you also have a right not to testify.  And [defense counsel] Mr. McMahon has his viewpoints about whether you should testify or not, but in the

> end, that's your decision. [¶] . . . So if you want to testify you are
> welcome to, and if you don't want to testify or you think that's [in]
> your best interest, that's okay too. But put some thought into it and
> work with Mr. McMahon on that. And in the end, when the People
> rest their case-in-chief, then I will turn to Mr. McMahon and ask if
> you have any witnesses. And at that point I will give you time to
> talk with Mr. McMahon about it but at the end it's really your
> decision. Okay?

RT 41. Mr. Hendrix responded, "Okay." RT 42. The record also shows that, after the

prosecution rested its case-in-chief, Mr. Hendrix was allowed a short recess to discuss with

counsel whether he would testify, after which counsel stated that the defense rested. *See* CT 383

(from 9:25 until 9:45 "off the record - Defendant Hendrix and counsel McMahon relocate to the

holding cell to discuss whether or not the defendant will testify"). After that short recess, Mr.

McMahon rested the defense case without calling any witnesses. RT 467. Mr. Hendrix remained

silent when counsel rested the defense without Mr. Hendrix testifying. There is no evidence that,

at the time of trial, he did not assent to counsel's recommendation that he not testify.

Mr. Hendrix urges that counsel "recommended even insisted" that he not testify. Docket

No. 7-9 at 105. The California Supreme Court reasonably could have determined that counsel did

not override the client's demand to testify because, by conferring with counsel and then remaining

silent when the defense rested, it was reasonable to conclude that Mr. Hendrix assented to the

attorney's decision not to call him as a witness. In other words, the California Supreme Court

reasonably could have determined that Mr. Hendrix assented to counsel's recommendation that he

not testify.

Moreover, the California Supreme Court reasonably could have determined that there was

no deficient performance by trial counsel in advising Mr. Hendrix not to testify because Mr.

Hendrix had problems as a witness. Counsel reasonably could have advised Mr. Hendrix not to

testify to avoid impeachment with his prior crimes. The trial court had ruled that, if Mr. Hendrix

testified, his prior convictions for assault, armed robbery, and possession of marijuana for sale

would be admitted for impeachment purposes. RT 158; CT 305-06. *See Dows v. Wood*, 211 F.3d

480, 487 (9th Cir. 2000) (defendant's three prior convictions "which, in all likelihood, would have

been admitted to impeach" the defendant if he testified showed that counsel "had very good reason

for suggesting that [defendant] not testify."); *Jones v. Cain*, 227 F.3d 228, 231 (5th Cir. 2000)

("the decision not to place Jones on the stand in light of his prior criminal history is a judgment call of trial counsel which seldom, if ever, will support a challenge of ineffective assistance of counsel").  One of those crimes also had some similarities to the crime for which he was being tried, i.e., the prior armed robbery also involved a female victim who was a stranger to Mr. Hendrix.  The trial court stated:  "he committed a similar brazen act though so long ago on a stranger, woman driving home and stopping at a traffic light, coming upon this, both women in each case out of the blue no where and assaulting the stranger, one with a gun and one with his hands."  *See* RT 11, 16.  Counsel also reasonably could have been concerned about Mr. Hendrix's ability to control himself as a witness, given the fact that Mr. Hendrix had blurted things out in front of the jury at his first trial.  *See* RT 40-41.[5]  Not only were there potential downsides to Mr. Hendrix testifying, defense counsel thought that Ms. Doe's "inconsistencies were enough" for Mr. Hendrix to avoid a conviction.  Docket No. 7-9 at 105.  Since there is a "reasonable argument that counsel satisfied *Strickland*'s deferential standard," *Harrington*, 562 U.S. at 105, Mr. Hendrix' habeas claim falters on the first prong.

The California Supreme Court also reasonably could have rejected the ineffective-assistance claim on the prejudice prong of *Strickland*.  Mr. Hendrix did not inform the California Supreme Court (or this Court) as to the substance of his testimony, had he testified.  Thus, one cannot determine whether he would have agreed with some, most or none of Ms. Doe's statements about what occurred that evening.  And, without knowing that, one cannot say that any prejudice resulted from counsel's recommendation that he not testify.  *See Matylinsky*, 577 F.3d at 1097 (defendant not prejudiced by counsel's advice not to testify at trial where his testimony would not have assisted his case but rather would have subjected defendant to damning cross-examination on prior convictions).  The evidence of Mr. Hendrix's guilt was strong:  Ms. Doe's testimony was

---

[5] During a hearing on *in limine* motions, the trial court granted the prosecutor's request that Mr. Hendrix be ordered "not to blurt things out in front of the jury, because apparently in the last trial he did that."  RT 40.  The court cautioned Mr. Hendrix that he could only speak from the witness stand, where he would be under oath and subject to cross-examination.  The court continued: "You can't just say things during the trial.  The way I understand it, the one time it happened in the last trial was probably because you were stressed out, and that's understandable, that happens, but I think you know you can't be yelling things out to the jury."  RT 40-41.

corroborated by her 9-1-1 call, her identification of Mr. Hendrix after the assault, and the DNA evidence. The jury found Ms. Doe credible, and found that Mr. Hendrix intended to commit rape. Mr. Hendrix fails to explain how the outcome of his trial would have been different if he had testified. Given the absence of any showing that, had he testified, Mr. Hendrix's testimony would have affected the outcome of the trial, one cannot say the California Supreme Court's rejection of the claim for lack of prejudice was contrary to or an unreasonable application of *Strickland*.

> ### 2.    Failure To Challenge The 9-1-1 Tape

Mr. Hendrix urges that his defense attorney was ineffective for failing to object to the admission of Ms. Doe's 9-1-1 call on the ground that it was hearsay, not within the exception for spontaneous statements.

The prosecutor moved *in limine* for the 9-1-1 call to be admitted pursuant to California Evidence Code Section 1240, which provides a hearsay exception for spontaneous statements. CT 303-05. At the hearing on the *in limine* motions, the trial court observed that "the defense objects to the 911 call being played. Both parties briefed this. The defense position is basically it was not a contemporaneous statement at the time the 911 call was made. The court is going to grant the People's motion and allow the 911 to be heard by the jury under Evidence Code 1240. RT 34. (The court at Mr. Hendrix's first trial also had ruled *in limine* that the 9-1-1 call would be admitted under California Evidence Code Section 1240. RT 24.)

The California Supreme Court reasonably could have rejected Mr. Hendrix's claim that counsel engaged in deficient performance in not objecting to the 9-1-1 tape because Mr. Hendrix was wrong on the facts: defense counsel had objected *in limine* to the admission of the 9-1-1 tape. This would have been an entirely reasonable application of *Strickland*, i.e., to determine that counsel did not fail to object when the record showed that counsel had objected *in limine*. To the extent Mr. Hendrix argues that counsel should have objected again during trial, he does not show that there was any basis to renew the objection to the evidence. *Cf. Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) (counsel's performance not deficient for failing to raise meritless objection); *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) (failure to take a futile action can never be deficient performance); *United States v. Tajeddini*, 945 F.2d 458, 463 (1st Cir. 1991),

1  *abrogated on other grounds by Roe v. Flores-Ortega*, 528 U.S. 470, 476 (2000) ("Counsel was not

2  required to rehash through a motion for rehearing the position the court had once rejected").

3      The California Supreme Court reasonably could have used similar reasoning to conclude

4  that no prejudice resulted from counsel not objecting to the 9-1-1 tape again at trial after

5  unsuccessfully objecting *in limine* to the same evidence. That is, the court reasonably could have

6  determined that Mr. Hendrix had not shown a reasonable probability that such an objection would

7  have been sustained. *See Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999) ("To show prejudice

8  under Strickland from failure to file a motion, Wilson must show that (1) had his counsel filed the

9  motion, it is reasonable that the trial court would have granted it as meritorious, and (2) had the

10  motion been granted, it is reasonable that there would have been an outcome more favorable to

11  him.")

12      Taking a "'highly deferential' look at counsel's performance," through § 2254(d)'s

13  already "'deferential lens,'" *Cullen v. Pinholster*, 563 U.S. at 190, it cannot be said that the

14  California Supreme Court's rejection of either of the ineffective assistance of counsel claims was

15  contrary to or an unreasonable application of *Strickland*. Mr. Hendrix is not entitled to relief on

16  either of his ineffective assistance of counsel claims.

17  D.    No Certificate Of Appealability

18      A certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c). This is not a case in

19  which "reasonable jurists would find the district court's assessment of the constitutional claims

20  debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Accordingly, a certificate of

21  appealability is **DENIED**.

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

# VI.   CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is **DENIED** on the merits. The Clerk shall close the file.

**IT IS SO ORDERED**.

Dated: April 4, 2018

_____
EDWARD M. CHEN
United States District Judge